**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARY BELL, derivatively on behalf of ROCKET PHARMACEUTICALS, INC., | |
| Plaintiff, | Case No.: 3:25-CV-16848 |
| vs. | |
| GAURAV SHAH, AARON ONDREY, ELISABETH BJÖRK, CARSTEN BOESS, MIKAEL DOLSTEN, PEDRO GRANADILLO, GOTHAM MAKKER, FADY MALIK, PIRATIP PRATUMSUWAN, DAVID SOUTHWELL, RODERICK WONG and KEITH WOODS, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ROCKET PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Mary Bell ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Rocket Pharmaceuticals, Inc. ("Rocket" or the "Company"), files this Verified Shareholder Derivative Complaint against Gaurav Shah ("Shah"), Aaron Ondrey ("Ondrey"), Elisabeth Björk ("Björk"), Carsten Boess ("Boess"), Mikael Dolsten ("Dolsten"), Pedro Granadillo ("Granadillo"), Gotham Makker ("Makker"), Fady Malik ("Malik"), Piratip Pratumsuwan ("Pratumsuwan"), David Southwell ("Southwell"), Roderick Wong ("Wong"), and Keith Woods ("Woods") (collectively, the "Individual Defendants," and together with Rocket, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Rocket, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against

1

Defendants Shah and Ondrey for contribution under Sections 10(b) and 21D of the Securities Exchange Act (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rocket, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by Rocket's directors and officers from September 17, 2024 through May 26, 2025, inclusive (the "Relevant Period").

2.    Rocket is a biotechnology company operating in the United States and European markets that develops "gene therapy cures for patients with devastating rare diseases through the most innovative science and platforms to fulfill the promise of gene therapy for the betterment of our industry, science and humanity."[1] Rocket has set itself apart from its competitors by being the first company with safety and efficacy data for gene therapies targeting the heart.

3.    Leading up to the Relevant Period, the Company began developing the RP-A501 gene therapy. RP-A501 was the first gene therapy for the treatment of Danon disease, a rare

---

[1] https://rocketpharma.com/

disorder leading to heart failure, and for male patients, frequent death during adolescence or early adulthood.

4.    Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements pertaining to the safety and clinical trial progress of RP-A501. For example, on September 17, 2024, Rocket issued a press release titled "Rocket Pharmaceuticals Announced Completion of Enrollment in Phase 2 Pivotal Trial of RP-A501 for the Treatment of Danon Disease." (the "September 17 Press Release"). The September 17 Press Release touted the RP-A501 therapy, announcing the Company had progressed to the second phase of the clinical trial, stating "***The rapid recruitment of the Phase 2 trial signifies the positive views of the study clinicians regarding this investigational therapy***."[2]

5.    The truth regarding the safety of RP-A501 did not fully emerge until May 27, 2025, when the Company issued a press release titled "Rocket Pharmaceuticals Provides Update on Phase 2 Clinical Trial of RP-A501 for Danon Disease" (the "May 27 Press Release"). The May 27 Press Release revealed that a patient participating in the Phase 2 clinical trial for RP-A501 died from an unexpected Sudden Adverse Event ("SAE"). The May 27 Press Release further revealed that as a result of the SAE, the FDA was placing the Phase 2 clinical trial of RP-A501 on hold while Rocket and the FDA investigated the root cause of the SAE.

6.    The same day, the Company held a special call to discuss the May 27 Press Release (the "May 27 Special Call"). During the May 27 Special Call, Defendant Shah revealed the Company was investigating a recent protocol amendment in RP-A501's clinical trial that "introduced a novel immunomodulatory agent to the pretreatment regimen." Defendant Shah further revealed that the decision to introduce the novel immunomodulatory agent was made

---

[2] All emphasis has been added unless otherwise stated.

"several months ago" and that "the agent that was used was the C3 inhibitor, and it was introduced into this trial because there was ongoing evidence of complement activation in Danon disease."

7.    On this news, the price of the Company's stock fell $3.94 per share, or approximately 62.8%, from a closing price of $6.27 per share on May 23, 2025 to close at $2.33 per share on May 27, 2025.

8.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the effectiveness RP-A501 was overstated (2) to increase RP-A501's effectiveness to be in line with what was disclosed to investors, a C3 inhibitor was added to RP-A501 without being disclosed to investors; (3) the addition of the C3 inhibitor to RP-A501 led to an increased risk patients would suffer SAEs; (4) the Company's projected timeline for RP-A501's second phase of its clinical trial was unreliable; and (5) as a result, the safety and clinical, regulatory, and commercial success surrounding RP-A501 were overstated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while Defendants Shah and Ondrey engaged in improper insider sales, netting total proceeds of ***approximately $395,017.***

10.    In light of the Individual Defendants' misconduct—which has subjected the

Company, its Chief Executive Officer ("CEO") and its former Chief Financial Officer ("CFO") to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

17.     Plaintiff is a current shareholder of Rocket. Plaintiff has continuously held Rocket common stock at all relevant times.

### Nominal Defendant Rocket

18.     Rocket is a Delaware corporation with principal executive offices at 9 Cedarbrook Drive, Cranbury, New Jersey 08512. Rocket's common stock trades on the Nasdaq Global Market ("Nasdaq") under the symbol "RCKT."

### Defendant Shah

19.     Defendant Shah has served as the Company's CEO and as a Company director since January 2018.

20.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Shah made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| November 21, 2024 | 11,091 | $13.05 | $144,734 |

| February 21, 2025 | 16,303 | $10.58 | $172,486 |
| May 16, 2025 | 3,621 | $6.53 | $23,645 |
| May 20, 2025 | 2,253 | $6.45 | $14,532 |

Thus, in total, before the fraud was exposed, Defendant Shah sold 33,268 shares of Company common stock on inside information, for which he received approximately $355,400 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

21.    The Schedule 14A the Company filed with the SEC on April 30, 2025 (the "2025 Proxy Statement") stated the following about Defendant Shah:

> **Gaurav Shah, M.D.** has served as our Chief Executive Officer and as one of our directors since January 2018. Dr. Shah was appointed Chief Executive Officer of Private Rocket in September 2015. Prior to joining Private Rocket, from 2011-2015, Dr. Shah held various leadership positions at Novartis including Global Program Head for CART-19, Global Clinical Program Head for CTL-019 and Biosimilars, and Global Clinical Leader for Afinitor. Prior to Novartis, he spent three years at Eli Lilly and Company as Medical Director overseeing clinical development of numerous programs including olaratumab. During his industry tenure, he has participated in several drug development programs resulting in successful regulatory approvals, such as CTL-019 in pediatric ALL, the first cell and gene therapy approved in the U.S., and successful commercial launches. He also serves on the boards of Talaris Therapeutics, Inc. and privately-held Altheia Science. Prior to joining industry, Dr. Shah was Assistant Professor of Medicine/Oncology at Columbia University. He holds a B.A. in Behavioral Neuroscience from Harvard University and an M.D. from Columbia University. Dr. Shah completed his internal medicine residency at Brigham & Women's Hospital/Harvard Medical School and completed his hematology/oncology fellowship training at the Memorial-Sloan Kettering Cancer Center. We believe Dr. Shah is qualified to serve on our Board due to his role as Chief Executive Officer of the Company and his significant leadership and management experience in the biopharmaceutical industry.

**<u>Defendant Ondrey</u>**

22.    Defendant Ondrey served as the Company's CFO from March 2024 to September

5, 2025.

23.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Ondrey made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| April 4, 2025 | 7,489 | $5.29 | $39,617 |

Thus, in total, before the fraud was exposed, Defendant Ondrey sold 7,489 shares of Company common stock on inside information, for which he received approximately $39,617 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

24.     The 2025 Proxy Statement stated the following about Defendant Ondrey:

*Aaron Ondrey* joined Rocket in March 2024 and is currently our Chief Financial Officer. Mr. Ondrey most recently served as the Chief Financial Officer and principal and financial accounting officer of Mirati Therapeutics, Inc. ("Mirati"), a publicly traded commercial-stage oncology company (acquired by Bristol-Myers Squibb Company in January 2024), a position he held from November 2023 through January 2024, after previously serving as Interim Chief Financial Officer from August 2023 through November 2023. Mr. Ondrey had previously served as the Senior Vice President, Financial Planning and Analysis for Mirati since July 2022. Prior to his time at Mirati, Mr. Ondrey served as Vice President, Finance of Arena Pharmaceuticals, Inc., a publicly traded biotechnology company (acquired by Pfizer Inc. in March 2022) from January 2020 until July 2022. From December 2018 to January 2020, Mr. Ondrey served as Head of Global Commercial Finance at Alexion Pharmaceuticals, Inc., a publicly traded biotechnology company (acquired by AstraZeneca in July 2021). From March 2010 to November 2018, Mr. Ondrey served in various finance roles of increasing responsibility, most recently as Executive Director, Commercial Finance and Business Planning, at Regeneron Pharmaceuticals, Inc., a publicly traded biotechnology company. Mr. Ondrey received his Bachelor of Science in Business Administration and Finance from Case Western Reserve University.

**Defendant Björk**

25.    Defendant Björk has served as a Company director since April 2020. She also serves as the Chair of the Research & Development Committee and as a member of the Audit Committee.

26.    The 2025 Proxy Statement stated the following about Defendant Björk:

**Elisabeth Björk, M.D., Ph.D.** has served as one of our directors since April 2020. She is currently the Senior Vice President, Head of Late-Stage Development, Cardiovascular, Renal and Metabolism (CVRM), Biopharmaceuticals R&D at AstraZeneca, a publicly-traded multinational pharmaceutical and biotechnology company, leading the global development of medicines in this area. Prior to taking on this role in June 2012, Dr. Björk had several roles of increasing seniority within AstraZeneca, with responsibility for clinical phases I-IV. She is an endocrinologist by training and an associate professor of medicine at Uppsala University, and was Head of the Diabetes and Endocrinology Unit at the University Hospital, Uppsala, where she spent 15 years in clinical practice and diabetes research, before joining AstraZeneca in 2002. She is also a board member of Pharvaris N.V., Calliditas Therapeutics AB, Chalmers University of Technology, Chalmers Ventures AB, Björks Matematik o Mera AB and rfidcompare europe AB. We believe that Dr. Björk's qualifications to serve on our Board include her depth of knowledge of the pharmaceutical industry and her many years of experience in drug development.

**Defendant Boess**

27.    Defendant Boess has served as a Company director since January 2016. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee and the Commercial Committee.

28.    The 2025 Proxy Statement stated the following about Defendant Boess:

**Carsten Boess** has served as one of our directors since January 2016. He previously served as Executive Vice President of Corporate Affairs at Kiniksa Pharmaceuticals, a publicly-traded biotechnology company, and as Senior Vice President and Chief Financial Officer at Synageva Biopharma Corporation from 2011 until the company's acquisition by Alexion Pharmaceuticals in 2015. Prior to his role at Synageva, Mr. Boess served in multiple roles with increasing responsibility for Insulet Corporation, including Chief Financial Officer from 2006 to 2009 and Vice President of International Operations from 2009 to 2011. Prior to that, Mr. Boess served as Executive Vice President of Finance for Serono Inc. from 2005 to 2006. In addition, he was a member of the Geneva-based World Wide Executive Finance Management Team while at Serono. Mr. Boess was also Chief Financial Officer at Alexion Pharmaceuticals and was a finance executive at

Novozymes of North America and Novo Nordisk in France, Switzerland and China. He is also a board member of Avidity Biosciences, Inc. and Achilles Therapeutics plc, a privately held biopharmaceuticals company, and previously served on the board of directors of Health Sciences Acquisitions Corporation 2. Mr. Boess received a Bachelor's degree and Master's degree in Economics and Finance, specializing in Accounting and Finance from the University of Odense, Denmark. We believe that Mr. Boess' qualifications to serve on our Board include his business and financial experience working at pharmaceutical companies.

**Defendant Dolsten**

29.    Defendant Dolsten has served as a Company director since September 2024. He also serves as a member of the Research & Development Committee.

30.    The 2025 Proxy Statement stated the following about Defendant Dolsten:

***Mikael Dolsten, M.D., Ph.D.*** has served as one of our directors since September 2024. Dr. Dolsten previously served as Chief Scientific Officer, President, Pfizer Research and Development at Pfizer, Inc., a global biopharmaceutical company, a position he commenced in July 2023. Prior to his role at Pfizer, Dr. Dolsten served as Chief Scientific Officer and President, Worldwide Research, Development and Medical from January 2019 until July 2023; President of Worldwide Research and Development from December 2010 until December 2018; Senior Vice President, President of Worldwide Research and Development from May 2010 until December 2010 and Senior Vice President, President of Pfizer BioTherapeutics Research & Development Group from October 2009 until May 2010. Dr. Dolsten served as Senior Vice President of Wyeth Pharmaceuticals, Inc., a public biopharmaceutical company, from 2008 until it was acquired by Pfizer in 2009, and President of Wyeth Research from 2008 to 2009. Prior to joining Wyeth, Dr. Dolsten was a Private Equity Partner at Orbimed Advisors, LLC, a healthcare-focused investment firm, and Executive Vice President, Head of Pharma Research at Boehringer Ingelheim, a pharmaceutical company. Dr. Dolsten also previously held research leadership positions at AstraZeneca plc, Pharmacia and Upjohn Company. Dr. Dolsten currently serves on the Board of Directors of Agilent Technologies, Inc. (NYSE:A), a U.S. publicly traded life sciences, diagnostics and applied chemical analysis company since September 2021 and Vimian Group AB, a Swedish public limited liability company supporting veterinary professionals, since April 2021. Dr. Dolsten previously served on the board of directors of Karyopharm Therapeutics Inc., a public pharmaceutical company from March 2015 to December 2021. We believe that Dr. Dolsten's qualifications to serve on our Board include his experience working at pharmaceutical companies and extensive knowledge of the healthcare industry.

**Defendant Granadillo**

31.     Defendant Granadillo served as a Company director from January 2018 to September 30, 2025. He also served as the Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

32.     The 2025 Proxy Statement stated the following about Defendant Granadillo:

*Pedro Granadillo* has served as one of our directors since January 2018. He has over 40 years of biopharmaceutical industry experience with expertise in human resources, manufacturing, quality and corporate governance. From 1970 until his retirement in 2004, Mr. Granadillo held multiple leadership roles at Eli Lilly and Company, a publicly-traded pharmaceutical company, including Senior Vice President of Global Manufacturing and Human Resources and a member of the Executive Committee. Mr. Granadillo has previously served on the boards of directors at Haemonetics Corporation, Dendreon Corporation, Health Sciences Acquisitions Corporation, Health Sciences Acquisitions Corporation 2 and Noven Pharmaceuticals, as well as NPS Pharmaceuticals, which sold to Shire for $5.2 billion in 2015. He graduated from Purdue University with a Bachelor of Science in Industrial Engineering. We believe that Mr. Granadillo's qualifications to serve on our Board include his depth of knowledge of the pharmaceutical industry and his many years of experience serving on the boards of directors of healthcare companies.

**Defendant Makker**

33.     Defendant Makker served as a Company director from January 2018 to September 24, 2025. He also served as a member of the Compensation Committee and the Research & Development Committee.

34.     The 2025 Proxy Statement stated the following about Defendant Makker:

*Gotham Makker, M.D.* has served as one of our directors since January 2018. Dr. Makker has over 20 years of healthcare industry experience. Dr. Makker currently serves as head of Strategic Investments for RTW, a position he has held since 2019. From 2005 to 2019, he served as Chief Executive Officer of Simran Investment Group, LLC, a closely held equity investment fund. Prior to Simran, Dr. Makker was a healthcare portfolio manager and principal at Citadel Investment Group LLC, a position he held from 2002 to 2005. Prior to joining Citadel, Dr. Makker served as an analyst at Oracle Partners LP covering biotechnology and medical device sectors from 2000 to 2001. From 1999 to 2000, Dr. Makker was a senior analyst on the life sciences investment banking team at Hambrecht & Quist. Dr. Makker has previously served on the board of directors of Health Sciences Acquisitions Corporation. Dr. Makker received an M.D. from the University of

Nebraska Medical School, and he completed the Sarnoff cardiovascular research fellowship at Columbia University, College of Physicians & Surgeons and at Harvard Medical School, Brigham & Women's Hospital. We believe that Dr. Makker's qualifications to serve on our Board include his years of experience in, and extensive knowledge of, the healthcare industry.

**Defendant Malik**

35.    Defendant Malik has served as a Company director since March 2022. He also serves as a member of the Research & Development Committee.

36.    The 2025 Proxy Statement stated the following about Defendant Malik:

*Fady Malik, M.D., Ph.D.* has served as one of our directors since March 2022. Dr. Malik has served as the Executive Vice President of Research and Development at Cytokinetics, Inc., a publicly-traded biopharmaceutical company focused on discovering, developing, and commercializing muscle activators and inhibitors, since November 2015, and he has been with Cytokinetics since its inception in 1998. Prior to taking on his current role in 2015, Dr. Malik had several other roles of increasing seniority within Cytokinetics, including serving as the Senior Vice President of Research and Development from August 2014 to November 2015, as the Senior Vice President of Research and Early Development from June 2012 to August 2014 and as Vice President, Biology from March 2008 to June 2012, all of which roles were focused towards building Cytokinetics' cardiovascular and skeletal muscle programs from their conception. In addition, since 2000, Dr. Malik has held an appointment in the Cardiology Division of the University of California, San Francisco, where he is currently a Clinical Professor. Dr. Malik is a cardiologist by training, and he was a practicing Interventional Cardiologist at the San Francisco Veterans Administration Medical Center for over 18 years. Dr. Malik received a B.S. from the University of California at Berkeley, a Ph.D. from the University of California at San Francisco and his M.D. from the University of California at San Francisco. We believe that Dr. Malik's qualifications to serve on our Board include his depth of knowledge of the pharmaceutical industry and his many years of experience in clinical research and drug development.

**Defendant Pratumsuwan**

37.    Defendant Pratumsuwan has served as a Company director since January 2025.

38.    The 2025 Proxy Statement stated the following about Defendant Pratumsuwan:

*Piratip Pratumsuwan* has served as one of our directors since January 2025. Mr. Pratumsuwan has over a decade of experience in healthcare investment and research and is currently Managing Director, Research Analyst at RTW, where he has been integral to guiding the firm's investment strategy since joining in 2014

directly from academia. Mr. Pratumsuwan specializes in researching transformative technologies, with a particular focus on gene therapy and gene editing. He leads RTW's comprehensive efforts in these fields, which encompass investments in both public and private companies as well as within academic institutions. Mr. Pratumsuwan holds an M.A. in Biotechnology from Columbia University and a B.S. in Biochemistry from McGill University. We believe that Mr. Pratumsuwan is qualified to serve on our board due to his experience in healthcare investment and research.

## Defendant Southwell

39.    Defendant Southwell has served as a Company director since August 2014. He also

served as the Chair of the Nominating and Corporate Governance Committee.

40.    The 2025 Proxy Statement stated the following about Defendant Southwell:

***David P. Southwell*** has served as one of our directors since August 2014. He served as President, Chief Executive Officer and board member of TScan Therapeutics, a publicly-traded, clinical-stage biopharmaceutical company from October 2018 through March 2023. Mr. Southwell previously served as the President and Chief Executive Officer of Inotek from July 2014 to January 2018. From March 2010 to October 2012, Mr. Southwell served as Executive Vice President, Chief Financial Officer of Human Genome Sciences, Inc., which is owned by GlaxoSmithKline plc. Prior to his time at Human Genome Sciences, Mr. Southwell served as Executive Vice President and Chief Financial Officer of Sepracor Inc. from July 1994 to July 2008. Mr. Southwell has also served on the board of directors of PTC Therapeutics Inc. since December 2005 and Spero Therapeutics, Inc. from February 2018 to April 2019. Mr. Southwell received a B.A. from Rice University and an M.B.A. from Dartmouth College, where he served on the Board of Overseers from 2011 to 2020. We believe that Mr. Southwell's qualifications to serve on our Board include his broad experience serving on the boards of directors of public companies, his specific experience with public therapeutics companies and his executive leadership, managerial and business experience.

## Defendant Wong

41.    Defendant Wong has served as a Chairman of the Board since January 2018.

42.    The 2025 Proxy Statement stated the following about Defendant Wong:

***Roderick Wong, M.D.*** has served as Chairman of our Board since January 2018. Dr. Wong served as the Chairman of the Board for Private Rocket from July 2015 until January 2018. Dr. Wong has over 20 years of healthcare investment experience. Since 2010, he has served as Managing Partner and Chief Investment

Officer of RTW Investments, LP ("RTW"), a healthcare-centered investment firm. He also serves on the board of Avidity Biosciences, Inc. and Landos Biopharma, Inc. Prior to RTW, Dr. Wong was a Managing Director and the Portfolio Manager for the Davidson Kempner Healthcare Funds. Prior to joining Davidson Kempner, Dr. Wong held various healthcare investment and healthcare research roles at SAC Capital Company and Cowen & Company. Dr. Wong previously served on the board of directors of Penwest Pharmaceuticals, Health Sciences Acquisitions Corporation and Health Sciences Acquisitions Corporation 2. He received an M.D. from the University of Pennsylvania Medical School, received an M.B.A. from Harvard Business School, and graduated with a B.S. in Economics from Duke University. We believe that Dr. Wong is qualified to serve on our Board due to his service prior to the closing of the Reverse Merger as Chairman of the Board of Directors of Private Rocket and his years of experience in, and extensive knowledge of, the biopharmaceutical industry.

**Defendant Woods**

43.     Defendant Woods served as a Company director from December 2023 to June 2025. He also served as the Chair of the Commercial Committee and as a member of the Audit Committee.

44.     The Schedule 14A the Company filed with the SEC on April 29, 2024 (the "2024 Proxy Statement") stated the following about Defendant Shah:

> ***R. Keith Woods*** has served as one of our directors since December 2023. Mr. Woods is an experienced biopharmaceutical executive with a career spanning over 30 years in the sector, most recently serving as the Chief Operating Officer for argenx SE from April 2018 through June 2023. Mr. Woods led argenx through its important transition from an R&D organization to a global commercial organization, implementing and overseeing core commercial and medical teams in preparation for its first product launch, including sales, marketing, market access and reimbursement, business operations, patient services and medical affairs. Prior to argenx, Mr. Woods served as Senior Vice President of North American operations for Alexion Pharmaceuticals Inc., where he managed a team of several hundred people in the U.S. and Canada and was responsible for more than $1 billion in annual sales. Within Alexion, he previously served as vice president and managing director of Alexion UK, overseeing all aspects of Alexion's UK business, vice president of U.S. operations and executive director of sales, leading the launch of Soliris in atypical hemolytic uremic syndrome. Prior to joining Alexion, he held various positions of increasing responsibility within Roche, Amgen and Eisai over a span of 20 years. Mr. Woods currently serves on the board of directors of X4 Pharmaceuticals, TScan Therapeutics and Neurogene Inc. Mr. Woods holds a B.S. in marketing from Florida State University.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

45.     By reason of their positions as officers, directors, and/or fiduciaries of Rocket and because of their ability to control the business and corporate affairs of Rocket, the Individual Defendants owed Rocket and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Rocket in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Rocket and its shareholders so as to benefit all shareholders equally.

46.     Each director and officer of the Company owes to Rocket and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

47.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Rocket, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48.     To discharge their duties, the officers and directors of Rocket were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

49.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Rocket, the absence of good faith on their

part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Rocket's Board at all relevant times.

50.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

51.    To discharge their duties, the officers and directors of Rocket were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Rocket were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to Rocket's own Code of Business Conduct and Ethics (the "Code of

Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Rocket conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Rocket and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Rocket's operations would comply with all applicable laws and Rocket's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure

of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52.    Each of the Individual Defendants further owed to Rocket and the shareholders the duty of loyalty requiring that each favor Rocket's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

53.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Rocket and were at all times acting within the course and scope of such agency.

54.    Because of their advisory, executive, managerial, directorial, and controlling positions with Rocket, each of the Individual Defendants had access to adverse, non-public information about the Company.

55.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Rocket.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance,

future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

58.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Rocket was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

59.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

60.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Rocket and was at all times acting within the course and scope of such agency.

<u>**ROCKET'S CODE OF CONDUCT**</u>

61.    In the section of Rocket's Code of Conduct, "Introduction and Guiding Principles," under the subsection "Introduction," the Code of Conduct states:

> The Rocket Code of Business Conduct and Ethics (the "Code") applies to all employees, officers and directors of Rocket Pharmaceuticals, Inc. (the "Company" or "Rocket"). Rocket expects its independent contractors, consultants and other

third parties working with Rocket to comply with all applicable laws and regulations, as well as with the compliance principles set forth in this Code. The Company strives to uphold high legal and ethical principles and standards and has adopted this Code to promote:

• Compliance with applicable governmental laws, rules and regulations;

• Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest;

• Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the United States Securities and Exchange Commission ("SEC"), other regulatory agencies and in the Company's other public communications;

• The prompt internal reporting of suspected violations of this Code to appropriate persons or through the Compliance and Ethics Helpline;

• Complete cooperation in the investigation of reported violations and the provision of truthful, complete and accurate information; and

• Accountability for adherence to this Code.

62.    In the same section, under a subsection titled "Your Responsibilities," the Code of

Conduct states the following:

This Code is meant to familiarize you with the Company's commitment to conducting business in a lawful and ethical manner. Although the Code references other Rocket policies, it does not supersede those policies. It is important that all employees read, understand and comply with the Code and other policies that apply to them as an employee of Rocket and to their specific position. We expect all Rocket employees, officers and directors to:

• Understand and comply with the Code and all other Rocket policies in both spirit and intended principle;

• Always act with honesty, integrity and high ethical standards in conducting Rocket business;

• Consistently treat fellow employees, patients and others with whom we do business with respect;

• Ask questions if you are unsure about what to do in a particular situation;

• Promptly report any violations of law or other misconduct that are significant in nature or scope to the Compliance Officer, through the Compliance and Ethics

Helpline or other appropriate channel;

• Comply with this Code both on Rocket premises and when representing the Company offsite (including at trade shows, investigator meetings and conferences), even if the local laws or customs have lower or different standards;

• Fully and honestly cooperate with any investigation of alleged misconduct; and

Refrain from engaging in any conduct that is, or may be perceived to be, retaliatory against anyone for raising a good faith question or concern about compliance with policy or legal requirements.

This Code does not and cannot cover every possible situation or activity governed by the laws, rules, regulations and ethical standards applicable to our industry. Rather, it summarizes certain laws and principles of ethical business conduct and provides guideposts to assist you in engaging in lawful and ethical conduct.

63.    In the same section, under the subsection titled "Additional Responsibilities of Managers and Directors," the Code of Conduct states the following:

If you are a manager, officer or director, you have additional responsibilities for creating and upholding a culture of compliance and must serve as a positive role model for employees. Managers and directors are responsible for:

• Creating an environment where employees are encouraged to ask questions and raise concerns without hesitation or fear of retaliation;

• Demonstrating commitment to maintaining high ethical standards and the importance of compliance with the Code;

• Promoting honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest; and

• Promptly reporting any and all suspected violations of the law, the Code or other Rocket policies that are significant in nature or scope.

64.    In the same section under a subsection titled "Reporting Compliance Concerns," the Code of Conduct states:

The best starting point for seeking advice on ethics-related issues or reporting potential violations of this Code will usually be your manager or Rocket's Compliance Officer (compliance@rocketpharma.com).

However, if the conduct in question involves your manager or the Compliance

Officer, if you have reported the conduct in question to your manager or the Compliance Officer and do not believe that he or she has dealt with it properly, or if you do not feel that you can discuss the matter with your manager or the Compliance Officer, there are other options. You may call our Compliance and Ethics Helpline number at 844-990-0002; submit a report online at https://report.syntrio.com/rocketpharma; send an e-mail to reports@lighthouse-services.com (anonymity can be maintained); or write to the Audit Committee, c/o Rocket Pharmaceuticals, Inc., 9 Cedarbrook Drive, Cranbury, NJ 08512.

While we prefer that you identify yourself when reporting violations so that we may follow up with you for additional information as needed, you may leave messages through these channels anonymously.

65.    In the section titled "Conducting Our Business," under the subsection titled

"Compliance with Laws, Rules and Regulations Worldwide," the Code of Conduct states:

Our industry is highly regulated, and regulation affects virtually every area of Rocket's business. Rocket and all of its employees are required to comply with all laws, rules and regulations that apply to the operations of the Company. We are members of the Biotechnology Innovation Organization (BIO) and have made a commitment to uphold their standards as well. Because Rocket conducts activities outside of the United States, the laws and regulatory requirements of more than one country may apply to certain activities. In the event local laws and regulatory requirements differ from the Code or other Rocket policy, the stricter requirements generally apply. The actions of each employee must reflect the Company's commitment to honest, ethical and professional conduct. We do not compromise our standards for any reason, including to achieve any goal. We expect our independent contractors, consultants and other third parties working with Rocket to comply with the principles set forth in this Code, as well as with the applicable laws and regulations of the countries in which they operate and with internationally accepted best practice standards. If you have questions about which laws, regulations, policies or standards apply to your role and activities, please consult with your manager or the Legal or Compliance Departments.

66.    Under the same section, under a subsection titled "Insider Trading," the Code of

Conduct states:

All Rocket employees are prohibited from buying, selling or engaging in any other transaction with respect to securities of Rocket or any other company while in possession of material, nonpublic information. Material information is any information that a reasonable investor would consider important in making an investment decision. In other words, you cannot use non-public information obtained through your employment to buy or sell securities. All employees must also refrain from sharing, tipping or disclosing material, non-public information

with others. This remains true even in the event that you are no longer working with or for Rocket. Please refer to Rocket's Insider Trading Policy for more information. If you are uncertain about the constraints on your purchase or sale of any securities by virtue of your relationship with Rocket, you should consult with the Compliance Officer before making any such purchase or sale. Securities laws and violations are taken very seriously.

67.     Under the section titled "Protecting Our Employees," under a subsection titled "Conflicts of Interest," the Code of Conduct states:

Conflicts of interest may take many forms. Employees, officers and directors must act in the best interests of Rocket. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest," or even the appearance of a conflict of interest, which can harm the trust of our Page 10 of 12 patients, fellow employees, suppliers and other business partners. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have a personal interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.

68.     Under the section titled "Safeguarding Our Organization," under the subsection titled "Accuracy of Books and Records and Public Reports," the Code of Conduct states:

Employees, officers and directors must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations. All Rocket books, records and accounts will be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. Rocket's financial statements must conform to generally accepted accounting rules and the Company's accounting policies. No undisclosed or unrecorded account or fund should be established for any purpose. No false or misleading entries should be made in Rocket's books or records for any reason, and no disbursement of corporate funds or other corporate property should be made without adequate supporting documentation. It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the SEC and in other public communications. It is your responsibility to report any concerns regarding questionable or fraudulent accounting or auditing matters or complaints regarding accounting, internal accounting controls or auditing matters.

69.     In the same section, under the subsection "Waivers and Approvals," the Code of Conduct states:

Only the Board of Directors may waive any specific provision of this Code. In the

event of an approved waiver involving the conduct of an executive officer or director, appropriate and prompt disclosure must be made to the Company's shareholders as required by applicable law and stock exchange rules.

70.     In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.  Also in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

71.     The Company also maintains an Audit Committee Charter. Under the section "General Statement of Purpose," the Audit Committee Charter states:

> The purposes of the Audit Committee of the Board of Directors (the "Audit Committee") of Rocket Pharmaceuticals, Inc. (the "Company") are to:
>
> • oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;
>
> • take, or recommend that the Board of Directors of the Company (the "Board") take, appropriate action to oversee the qualifications, independence and performance of the Company's independent auditors; and
>
> • prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

72.     Under the heading titled "Responsibilities and Authority," in the subsection titled "Review of Charter," the Audit Committee Charter states:

> The Audit Committee shall review and reassess the adequacy of this Charter annually and recommend to the Board any amendments or modifications to the Charter that the Audit Committee deems appropriate.

73.     Under the same heading, in a subsection titled "Annual Performance Evaluation of the Audit Committee," the Audit Committee Charter states that the Audit Committee shall, "At least annually, the Audit Committee shall evaluate its own performance and report the results of such evaluation to the Board."

74.     Under the same heading, in a subsection titled "Audited Financial Statements and Annual Audit," the Audit Committee Charter states:

• The Audit Committee shall review the overall audit plan (both internal and external) with the independent auditors and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

• The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the independent auditors the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

• The Audit Committee must review:

(i) any analyses prepared by management, the internal auditors, if any, and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles, or GAAP, methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the independent auditors. The Audit Committee may also consider other material written communications between the registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

(ii) major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

(iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's

selection or application of accounting principles; and

(iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

\*\*\*

The Audit Committee shall review and discuss with the independent auditors any audit problems or difficulties and management's response thereto. This review shall include (1) any difficulties encountered by the independent auditors in the course of performing their audit work, including any restrictions on the scope of their activities or their access to information, (2) any significant disagreements with management and (3) a discussion of the responsibilities, budget and staffing of the Company's internal audit function.

• This review may also include:

(i) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise);

(ii) any communications between the audit team and the audit firm's national office regarding auditing or accounting issues presented by the engagement; and

(iii) any management or internal control letter issued, or proposed to be issued, by the independent auditors.

\*\*\*

If brought to the attention of the Audit Committee, the Audit Committee shall discuss with the Chief Executive Officer and Senior Accounting Executive of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

• Based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditors of the matters required to be discussed by SAS 61, and (3) with the independent auditors concerning the independent auditor's independence, the Audit Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

• The Audit Committee shall prepare the Audit Committee report required by Item 407(d) of Regulation S-K of the Exchange Act (or any successor provision) to be included in the Company's annual proxy statement.

75.    In the same section, under the subsection "Unaudited Quarterly Financial Statements," the Audit Committee Charter states:

• The Audit Committee shall discuss with management and the independent auditors, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Audit Committee's attention by the independent auditors pursuant to Statement on Auditing Standards No. 100, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

76.    In the same section, under the subsection "Earnings Press Releases," the Audit Committee Charter states:

• The Audit Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

77.    In the same section, under the subsection "Risk Assessment and Management," the Audit Committee Charter states:

• The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

• In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major financial risk exposures and the steps that the Company's management has taken to monitor and control such exposures.

78.    In the same section, under the subsection "Regular Reports to the Board," the Audit Committee Charter states:

• The Audit Committee shall regularly report to and review with the Board any

issues that arise with respect to ethics-related issues, the Company's Code of Business Conduct and Ethics, as amended, quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent auditors, the performance of the internal audit function and any other matters that the Audit Committee deems appropriate or is requested to review for the benefit of the Board.

79.    In the section "Additional Authority," under the subsection "Legal and Regulatory Compliance," the Audit Committee Charter states:

• The Audit Committee may discuss with management and the independent auditors, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

• The Audit Committee may discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

80.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **SUBSTANTIVE ALLEGATIONS**

### *Background*

81.    Rocket is a biotechnology company that provides patients with a platform-agnostic

approach to gene therapy to cure the root causes of rare and complex childhood disorders. Gene therapy is a technique that cures or treats diseases by manipulating or modifying a person's genes. Rocket has set itself apart from its competitors by being the first biotechnology company with safety and efficacy data for gene therapies targeting the heart.

82.     Leading up to the Relevant Period, the Company began developing a gene therapy for Danon disease. Danon disease is a rare gene coding disorder caused by mutations in lysosome-associate membrane protein 2. The result of which ultimately leads to heart failure, and for male patients, frequent death during adolescence or early adulthood due to an accumulation of autophagosomes and glycogen in cardiac muscle and other tissue. The only available treatment for Danon disease is cardiac transplantation, which is associated with complications and is not considered curative.

83.     In June 2019, Rocket announced that it had begun dosing patients in Phase 1 of RP-A501's clinical trial and would provide investors with promising updates regarding the safety and efficacy results during the first phase of the clinical trial.  The FDA may place a clinical trial on hold if complications or SAEs arise, such as Thrombotic Microangiopathies ("TMAs"), which is a medical disease affecting blood vessels.  When a clinical trial is placed on hold, the Company and the FDA address the cause of the complication before the clinical trial is resumed.

**False and Misleading Statements**

*September 17, 2024 Press Release*

84.     On September 17, 2024, the Company issued the September 17 Press Release, titled "Rocket Pharmaceuticals Announced Completion of Enrollment in Phase 2 Pivotal Trial of RP-A501 for the Treatment of Danon Disease," announcing that the Company began recruiting for the next phase of RP-A501's clinical trial. The September 17 Press Release stated in relevant part:

Rocket [. . .] today announced that all patients have been enrolled in the global,

pivotal Phase 2 clinical trial evaluating RP-A501 to treat male patients with Danon disease.

After the two-patient safety run-in, followed by harmonized global site activations, the remaining 10 patients were enrolled across the United States (U.S.) and European Union within three months. Given the prevalence of Danon disease across regions, the Company plans to pursue regulatory filings concomitantly in the U.S. and ex-U.S.

***"From a clinical perspective, the important thing is that we are moving closer to the goal of having a treatment for patients with Danon disease***," said Barry H. Greenberg, MD, FHFSA, Director of the Advanced Heart Failure Treatment Program and Distinguished Professor of Medicine at UC San Diego Health. "I can attest to the excitement and anticipation within the Danon patient community for this novel, one-time treatment designed to improve cardiac abnormalities associated with Danon disease and help preserve normal cardiac function by delivering functional LAMP2B genes to the heart tissue. ***The rapid recruitment of the Phase 2 trial signifies the positive views of the study clinicians regarding this investigational therapy***."

***November 7, 2024 Earnings Press Release***

85.    On November 7, 2024, Rocket issued a press release announcing its financial results for the third quarter of 2024 (the "3Q 2024 Earnings Press Release"). The 3Q 2024 Earnings Press Release also provided investors with an update for the second phase of RP-A501's clinical trial, stating in relevant part:

"***Rocket made meaningful progress during the third quarter, notably with the completion of enrollment in the RP-A501 program for Danon disease***, low dose cohort enrollment completion in the RP-A601 program for PKP2-ACM, and appointment of seasoned pharmaceutical executive, Mikael Dolsten to our Board of Directors," said [Defendant] Shah[.] "As we continue to pursue our mission of seeking gene therapy cures for patients with rare and devastating diseases, we remain focused on expediently advancing our deep pipeline of cardiovascular and hematology programs."

**Recent Pipeline and Operational Updates**

• Continued advancement of Phase 2 pivotal study of RP-A501 for Danon Disease.

   o In September, Rocket announced completion of enrollment in the Phase 2 pivotal study of RP-A501 to treat Danon Disease.

o Dosing in the Phase 2 pivotal study is ongoing.

o Updated data from the Phase 1 study to be presented at the American Heart Association's 2024 Late-Breaking Science sessions on November 18.

***November 18 2024 Press Release***

86.    On November 18, 2024, Rocket issued a press release titled "Rocket Pharmaceuticals Announced New England Journal of Medicine Publication of Phase 1 RP-A501 Long Term Data and Presents Late-Breaking Scientific Sessions at 2024 American Heart Association Conference" (the November 18 Press Release"). The November 18 Press Release quoted Defendant Shah in touting the safety and effectiveness of RP-A501, stating in relevant part:

"***Data presented today at AHA and published in The New England Journal of Medicine represents a critical milestone for the RP-A501 program and cardiac gene therapy in general, demonstrating for the first time that AAV conferred long-term efficacy in a cardiac indication. This program represents the most comprehensive investigational gene therapy dataset for any cardiac condition***," said [Defendant] Shah[.] "As is true for many other recent internal and peer company programs, when gene therapy works, it is life changing. ***RPA501 is being developed as a potential one-time gene therapy and the results of the long-term Phase 1 study show the promise of gene therapy across cardiac diseases, including PKP2-ACM, BAG3-DCM and others.***"

87.    The November 18 Press Release continued to highlight the safety and efficacy results of Phase 1 of RP-A501's clinical trial, stating in relevant part:

"***The long-term safety and efficacy results in the Phase 1 study are very encouraging for patients with Danon disease. In this study we found consistent, robust improvements and/or normalization across multiple quantifiable parameters that cardiologists use in clinical practice for assessing risk and making management decisions***," said Barry H. Greenberg, MD, FHFSA, Distinguished Professor of Medicine at University of California San Diego School of Medicine and Director of the Advanced Heart Failure Treatment Program at UC San Diego Health, primary investigator of the RP-A501 Phase 1 trial and primary author of the manuscript. "***Currently, there are no other therapies that have been shown to demonstrate improvement of Danon disease-related cardiomyopathy, and while heart transplantation can prolong life, it is not curative and is associated with significant one-year mortality and complications. Data from this study shows promise for the Danon disease community***."

*February 27, 2025 Earnings Press Release and Form 10-K*

88.    On February 27, 2025, the Company issued a press release announcing its fourth quarter and full year 2024 financial results (the "FY 2024 Earnings Press Release"). The FY 2024 Earnings Press Release discussed developments of the RP-A501 clinical trial, stating in relevant part:

> "In 2024, we made strong progress in advancing our gene therapy pipeline, underscored by the New England Journal of Medicine publication of the Phase 1 study of RP-A501 for Danon disease and long-term data presented at AHA showing its safety and meaningful efficacy up to five years. Our momentum continues as we progress with the Phase 2 pivotal trial of RP-A501 and the Phase 1 trial of RP-A601 for PKP2-ACM, and we remain on track to submit the IND for BAG3- DCM in the first half of 2025," said [Defendant] Shah[.] "Looking ahead to 2025, we will maintain our focus and resources on advancing our AAV cardiovascular programs while seeking to realize value in our full pipeline in a thoughtful manner, so we deliver the greatest value to our patients and shareholders."
>
> **Recent Pipeline and Operational Updates**
>
> • **Dosing in the Phase 2 pivotal study of RP-A501 for Danon disease is ongoing.**
>
>> o Details of the Phase 2 pivotal study can be found at www.ClinicalTrials.gov under NCT identifier NCT06092034.
>>
>> o Program update anticipated in the first half of 2025.
>
> • **Long-term data from the Phase 1 study of RP-A501 for Danon disease published in *The New England Journal of Medicine* and new data presented at the American Heart Association's 2024 Late-Breaking Science sessions.**
>
>> o RP-A501 demonstrated safety and meaningful efficacy; all evaluable patients show cardiac LAMP2 expression and ≥10% reduction in LV mass index at 12 months and sustained through most recent follow up (up to five years).
>>
>> o Evidence of sustained clinically meaningful improvement was observed in pediatric patients followed up to 24 months and adult/adolescent patients followed up to 60 months.
>>
>> o All evaluable patients had reductions in NYHA heart failure (from Class II to Class I; no longer displaying symptoms of heart failure), improvements in KCCQ (median 27-point increase), and substantial improvements in troponin (median reduction 84%) and BNP (median reduction 57%) observed 24-54

months after treatment.

89.     The same day, the Company filed a Form 10-K with the SEC for its 2024 fiscal

year (the "2024 Form 10-K"). The 2024 Form 10-K was signed by Defendants Shah, Ondrey,

Björk, Boess, Dolsten, Granadillo, Makker, Malik, Pratumsuwan, Southwell, Wong, and Woods.

The 2024 Form 10-K also included certifications by Defendants Shah and Ondrey, made pursuant

to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of the 2024 Form 10-K and

that the 2024 Form 10-K "does not contain any untrue statement of a material fact or omit to state

a material fact necessary to make the statements made."

90.     The 2024 Form 10-K represented that the Company was "a fully integrated, late-

stage biotechnology company focused on the development of first, ***only and best in class gene***

***therapies, with direct on-target mechanism of action and clear clinical endpoints, for rare and***

***devastating diseases.***"

91.     Additionally, the 2024 Form 10-K elaborated on the Company's strategy for its

short and medium-term gene therapies, stating in relevant part:

> We seek to bring hope and relief to patients with devastating, undertreated and rare
> pediatric diseases through the development and commercialization of potentially
> curative first in class gene therapies. As a fully-integrated biotechnology company,
> we are well positioned to achieve these objectives. In the near and medium-term,
> we intend to develop our first-in-class product candidates, which target devastating
> diseases with substantial unmet need, develop proprietary in-house analytics and
> manufacturing capabilities and continue to conduct registration trials for our
> currently planned programs. In the medium and long-term, pending favorable data,
> we expect to submit BLAs for the rest of our suite of clinical programs, and
> establish our gene therapy platform and expand our pipeline to target additional
> indications that we believe to be potentially compatible with our gene therapy
> technologies. In addition, during that time, we believe that our currently planned
> programs will become eligible for priority review vouchers from the FDA that
> provide expedited review. We have assembled a leadership and research team with
> expertise in cell and gene therapy, rare disease drug development, product approval
> and commercial launches.
>
> We believe that our competitive advantage lies in our disease-based selection

approach, a rigorous process to identify target diseases and ability to develop products to treat identified target diseases. We believe that this approach to asset development differentiates us as a gene therapy company and potentially provides us with a first-mover advantage and first-to-market of meaningful treatments for devastating, undertreated, and rare pediatric diseases.

***May 8, 2025 Earnings Press Release***

92.    On May 8, 2025, the Company issued a press release announcing its financial results for the first quarter of 2025 (the "1Q 2025 Earnings Press Release"). The 1Q 2025 Earnings Press Release continued to tout the RP-A501 therapy, stating in relevant part:

**Recent Pipeline and Operational Updates**

**• Phase 2 pivotal study of RP-A501 for Danon disease is ongoing.**

o Program update anticipated in mid-year 2025 and a clinical data readout expected in mid-year 2026. Details of the Phase 2 pivotal study can be found at www.ClinicalTrials.gov under NCT identifier NCT06092034.

o In March, the largest longitudinal natural history study of Danon disease to date was published in the Journal of the American Heart Association (JAHA), revealing key insights into the distinct cardiac patterns of Danon disease patients, showing earlier, more severe heart issues in male patients, while also noting that many females develop progressive cardiomyopathy and heart failure in adolescence or early adulthood.

93.    The above statements in ¶¶ 84-92 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the effectiveness of RP-A501 was overstated (2) to increase RP-A501's effectiveness to be in line with what was disclosed to investors, a C3 inhibitor was added to RP-A501 without being disclosed to investors; (3) the addition of the C3 inhibitor to RP-A501 led to an increased risk patients would suffer SAEs; (4) the Company's projected timeline for RP-A501's second phase of its clinical trial was unreliable; and (5) as a result, the safety and clinical, regulatory, and commercial success surrounding RP-A501 were overstated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Fully Emerges

### May 27, 2025 Press Release and Special Call

94.    The truth did not emerge until May 27, 2025, when the Company issued the May

27 Press Release. The May 27 Press Release revealed that the FDA placed Phase 2 of RP-A501's

clinical trial on hold due to a participant dying as a result of a SAE. The May 27 Press Release

stated in relevant part:

> ***A patient participating in the Phase 2 pivotal trial of RP-A501 experienced an unexpected Serious Adverse Event (SAE).*** The SAE involved clinical complications related to a capillary leak syndrome. ***Rocket is conducting a comprehensive root cause analysis and remains in active dialogue with the U.S. Food and Drug Administration (FDA) and other key stakeholders, with the current focus being on the recent introduction of a novel immune suppression agent to the pre-treatment regimen that had been implemented to mitigate complement activation observed in some patients***. This novel agent was specific to the AAV9-Danon program. ***Upon learning of the initial event, Rocket voluntarily paused further dosing in the study. On May 23, 2025, the FDA placed a clinical hold on the trial to allow for further evaluation. Rocket is deeply saddened to report that this patient has since passed away after an acute systemic infection.***
>
> Rocket is working with the FDA, the Independent Data Safety Monitoring Committee, clinical investigators, and scientific experts, and is committed to ensuring the safety of all study patients while resuming the trial as expeditiously as possible. ***While the clinical hold remains in place, the company is unable to provide guidance on the anticipated timing for completion of the Phase 2 trial***.
>
> "We are heartbroken by this loss and are fully committed to our mission to develop gene therapies that address the underlying cause of devastating diseases like Danon. We are immensely grateful for the patients and families who participate in this important research," said [Defendant] Shah[.]

95.    The same day, the Company held the May 27 Special Call to discuss RP-A501's

clinical trial and the patient death because of the SAE.

96.    During the May 27 Special Call, Defendant Shah disclosed that Rocket was looking

into the effect of a "recent protocol amendment that introduced a novel immunomodulatory agent"

to RP-A501 as a possible cause of the SAE, stating in relevant part:

A patient enrolled in our Phase II pivotal trial experienced an unexpected serious adverse event and clinical complications related to capillary leak syndrome. Rocket is conducting a comprehensive root cause analysis and remains in active dialogue with the FDA and other key stakeholders with the current focus being on the recent introduction of a novel immune suppression agent to the pretreatment regimen that has been implemented to mitigate complement activation.

Now this novel agent was specific to the Danon program and not for PKP2, BAG3 or other programs. Following this initial SAE, Rocket proactively and voluntarily paused further dosing in the study out of an abundance of caution. We immediately notified the U.S. FDA, and the FDA on May 23 placed the trial on clinical hold to allow for additional evaluation. ***Subsequently, the patient experienced additional medical and procedural complications during his hospital course and unfortunately passed away after a systemic infection.***

First and foremost, our thoughts are with the patient's family, caregivers and the treating clinical team. This is a deeply tragic loss, and we are committed to fully understanding their circumstances surrounding it objectively and neutrally. We are also immensely grateful to the family for their contribution to this important clinical research and their commitment to helping advance science for the broader Danon community.

***Now as was shared in our press release and just now, there is an ongoing and objective review to assess the root cause of the initial SAE. And as I mentioned, an area of focus is a recent protocol amendment that introduced a novel immunomodulatory agent to the pretreatment regimen. This change was implemented proactively to further enhance patient safety and was informed by the occurrence of complement activation earlier.***

***Rocket is carefully evaluating whether a mechanism related to the new agent may have influenced immune responses in an unexpected or paradoxical way. Again, this agent is specific to the Danon program and has not been used in PKP2, BAG3 or other programs. Also, these programs are not impacted by this clinical hold. We're working now with sites, external scientific experts and the FDA. And while the clinical hold remains in place, we're unable to provide guidance on the exact timing of completion of the Phase II trial.***

97.    The question-and-answer session of the May 27 Special Call included the following exchange in which Defendant Shah would clarify that the "novel immunomodulatory agent" was a C3 inhibitor and was added to increase RP-A501's efficacy:

<Joshua Elliot Schimmer – Cantor Fitzgerald & Co - Analyst> Condolences to the family of the patient. I guess are you able to provide any additional details around this event in terms of when it occurred, number one, what the specific immune or

novel agent was that -- was added? I guess this is incremental to the steroid, sirolimus and rituximab.

And then are you able to provide any comments in terms of the number of patients treated in the program to date? And if the answer to any of those is no, when might we expect to hear?

<Defendant Shah> *Yes. So the patient was treated in early May. And the agent that was used was the C3 inhibitor, and it was introduced into this trial because there was ongoing evidence of complement activation in Danon disease. And we aim to try to completely eliminate any TMA risk altogether*. So at that time, this particular agent was coming into the market and also we had some experience in pediatric patients. So the timing was right to try to eradicate the risk of TMA altogether, not just for Danon, but potentially as a read-through to other AAV programs across our portfolio and others. So it was with that in mind that we introduced this novel agent.

Now I will say that we are considering that as one option, one thought, one idea for root cause. We're doing a comprehensive root cause analysis pretty neutral and objectively, and this is one idea. It's the current focus, just one idea. And in terms of the number of patients, we're not quite ready to comment on that, but as the protocol, it goes through the FDA, and we have discussions with them to resolve the hold, we'll be able to provide further guidance.

98.    During the question-and-answer session of the May 27 Special Call, Defendant

Shah revealed the decision to add the C3 inhibitor was made several months earlier, stating:

< Mani Foroohar – Leerink Partners LLC – Analyst > I would add my condolences to the family of this patient. I want to follow up a little bit on Josh's question, which seem to be the most important. Can you give us a sense of when the decision was made to add this C3 inhibitor potentially to the protocol? Was this the only patient to receive this agent? And then I have a quick follow-up.

< Defendant Shah > *Yes. So the decision was made earlier several months ago to add this. And the -- there was one more additional patient who did receive this agent as well after this patient that we're talking about. And the second patient has had a much reduced course, has had evidence of capillary but has had a reduced course. What we were able to do here is learn from the first case and intervene so that we didn't see the same events happening in the second patient. So there are 2 cases like this now. And I will say that both of these cases are cases where this -- the only difference really was the introduction of this agent. So that's why that's one hypothesis that we're working with.*

99.    Later in the question-and-answer session of the May 27 Special Call, Defendant

Shah discussed two participants of the RP-A501 clinical trial who suffered SAEs and the timing of their consumption of the C3 inhibitor, stating:

> < Mani Foroohar – Leerink Partners LLC – Analyst > Okay. And when you talk -- so is the right interpretation of that, that you had some number of patients, at least these 2, who have had capillary leak syndrome after dosing with the AAV, after receiving the other 3 agents and the immunomodulatory regimen that Josh [ helpfully listed ]. And then after that, at some point, they had capillary leak syndrome and then this novel agent was given, and then they had an acute infection? Or did the acute infection come prior to the CPS and the novel agent was given after? Could you clarify the order of events there?

> < Defendant Shah > Sure. So yes, let's walk through the time line here in some granularity. ***So these are the only 2 patients that have seen what we're calling a capillary leak syndrome, the ones that we're talking about here. Now this agent is given before the infusion. It's given a few doses after infusion as well. And it's given in conjunction with the other standard immunomodulatory regimen, including rituximab, sirolimus and steroids with hopefully rapid taper. So all of that is given together. And it was a full package that was intended to eradicate complement activation as well as any later T cell responses to really focus on the safety profile of these patients in the days and weeks after therapy.*** Safety is, of course, our first priority here while we develop a full benefit-risk profile.

> So in terms of the occurrence of the medical events, about -- so we did not see TMA. We did not see other gene therapy effects like myocarditis. ***About a week after the infusion, that's when we started seeing some evidence of capillary leak.*** There were other medical complications and procedural complications in the week or so afterwards. And actually the patient was, at that time, stable and doing potentially well enough that we were cautiously optimistic of recovery. And the capillary leak was improving. Unfortunately, over the weekend, over this past weekend, he developed an acute systemic infection that accelerated his demise. That's the full sequence of events. And the clinical hold was placed on Friday -- the clinical hold was placed Friday just before this demise. So all of these -- the most severe events unfolded literally in the last 3 or 4 days.

100.    The question-and-answer session of the May 27 Special Call included the following exchange between an analyst and Defendant Shah regarding the other patients enrolled in the clinical trial but who did not suffer a SAE:

> < Avraham Leib Novick – Morgan Stanley – Research Associate > It's Avi Novick on the line for Mike. I guess are there any patients that have been enrolled in the study that have still not been infused with RPA501? And I guess just as a quick follow-up, were there any previously dosed patients who have had complement-

mediated adverse events?

< Defendant Shah >Yes. So there are patients who are still waiting to be treated. Our plan and the time line was such that we would have finished the treatment of these patients by midyear, which is when we were going to have the program update as we've guided to previously. So there were more patients left to be treated, all ready to go and were lined up to be treated shortly. Unfortunately, we had the setback that we're talking about today. So that's going to be paused.

***Earlier in the trial, we did see complement activation and TMA. It was a gene therapy-associated effect that's part of trial safety benefit that we usually read out at the end of the trial. And those patients are actually now doing well from a safety and potentially even an efficacy viewpoint. But because it was part of routine explained side effects of gene therapy, we continue with the program. There was no clinical hold, and we modified the protocol in the way that I described earlier, to continue to further mitigate the risk.***

101.    Defendant Shah would further discuss other TMAs associated with RP-A501 during the question-and-answer session of the May 27 Special Call, stating:

< Tyler Martin Van Buren – TD Cowen – Analyst > Since you discussed that this agent was introduced to reduce the incidence of TMAs, can you give more color on the incidence of TMAs that have been observed to date? Or any additional color on what you've seen so far in the trial?

< Defendant Shah > Yes. So there was an initial episode of TMA that was linked to a gene mutation, an additional gene mutation that confers complement sensitivity in some patients. We modified the protocol with the 14 panel test to reduce the -- or to eliminate those patients from enrolling who would have those sorts of gene mutations that exacerbate complement.

***There was another one that persisted. There was another TMA that we saw also. And TMA is a known risk of this therapy. We don't think that the risk is ever going to be zero. But in order to try to make it as close to zero as possible, we introduced this new inhibitor, and we're going to evaluate what finally happened here.***

And I should also say that those patients who did have those early complement activations have completely recovered from the sequelae and are doing well right now.

102.    The question-and-answer session of the May 27 Special Call also included the following exchange between an analyst and Defendant Shah regarding why the C3 inhibitor was

introduced in the second phase of the clinical trial despite the promising results of the first phase

of the clinical trial:

> <Thibaut R. Pardo-García – LifeSci Capital, LLC, - Research Associate > This is
> Thibaut Pardo for Cory Jubinville. My condolences to the family of the patient. So
> we have -- we had up to 5 years of AEs data that were going pretty well. So this
> Phase I program, we had everything pretty controlled with -- once the update to
> include rituximab, sirolimus and prednisone combo. Why take that risk of
> introducing a novel agent?

> < Defendant Shah > We always aim to provide the optimal experience for patients
> and really lean in on the benefit risk. And although at the time, we didn't know how
> rapidly these complement issues would and could resolve. So we worked with an
> abundance of caution putting patient safety first to make sure that other patients
> didn't necessarily have those experiences. Now since then, those patients, as I
> mentioned, have recovered fully from the complement activation issues. And I
> think that -- so we were trying to be extra careful with safety and trying to eliminate
> all risk altogether.

103. During the question-and-answer session of the May 27 Special Call, Defendant

Shah revealed the only patients who suffered SAEs were those who took the C3 inhibitor, stating:

> < Gil Joseph Blum – Needham & Company, LLC, Research - Analyst >And allow
> me to add my condolences. So just to be perfectly, perfectly clear, the only event
> of capillary leak syndrome that we're seeing were only when this agent was used?
> There was no evidence in any of the other patients?

> < Defendant Shah > That's correct.

104. On this news, the price of the Company's stock fell $3.94 per share, or

approximately 62.8%, from a close of $6.27 per share on May 23, 2025, to close at $2.33 per share

on May 27, 2025.

## DAMAGES TO ROCKET

105. As a direct and proximate result of the Individual Defendants' misconduct, Rocket

has lost and will continue to lose and expend many millions of dollars.

106. Such expenditures include, but are not limited to, legal fees, costs, and any

payments for resolution of or to satisfy a judgment associated with the Securities Class Action,

and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

107.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

108.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

109.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

110.    As a direct and proximate result of the Individual Defendants' conduct, Rocket has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

111.    Plaintiff brings this action derivatively and for the benefit of Rocket to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Rocket, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 21D of the Exchange Act.

112.    Rocket is named solely as a nominal party in this action. This is not a collusive

action to confer jurisdiction on this Court that it would not otherwise have.

113.    Plaintiff is, and has been at all relevant times, a shareholder of Rocket. Plaintiff will adequately and fairly represent the interests of Rocket in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

114.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

115.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Rocket's Board consisted of the following nine individuals: Defendants Shah, Björk, Boess, Dolsten, Malik, Pratumsuwan, Southwell, Wong (the "Director-Defendants") and nonparty Peter Fong (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time this action was filed.

116.    Demand is further excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants again unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

117.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the

Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

118.    Additional reasons that demand on Defendant Shah is futile follow. Defendant Shah has served as the CEO and as a Company director since January 2018. The Company provides Defendant Shah with his primary occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not independent. As the trusted, long-time Company CEO and as a director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Shah also signed the 2024 Form 10-K. Further, Defendant Shah's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Shah is named as a defendant in the Securities Class Action. For these reasons too, Defendant Shah breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand on Defendant Björk is futile follow. Defendant Björk has served as a Company director since April 2020. She also serves as the Chair of Research & Development Committee and as a member of the Audit Committee. Defendant Björk has

received and continues to receive handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Further, Defendant Björk signed the 2024 Form 10-K. For these reasons too, Defendant Björk breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

120.    Additional reasons that demand on Defendant Boess is futile follow. Defendant Boess has served as Company director since January 2016. He also serves as the Chair of the Audit Committee and as a member of the Commercial Committee and the Compensation Committee. Defendant Boess has received and continues to receive handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Boess signed the 2024 Form 10-K. For these reasons too, Defendant Boess breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.    Additional reasons that demand on Defendant Dolsten is futile follow. Defendant Dolsten has served as a Company director since September 2024. He also serves as a member of the Research & Development Committee. Defendant Dolsten has received and continues to receive handsome compensation for his role as a director. Additionally, in the 2025 Proxy Statement, the

Company admits that Defendant Dolsten is a non-independent director because he is a party to a consulting agreement with the Company pursuant to which he receives compensation for providing Research & Development consulting services. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Dolsten signed the 2024 Form 10-K. For these reasons too, Defendant Dolsten breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.   Additional reasons that demand on Defendant Malik is futile follow. Defendant Malik has served as a Company director since March 2022. He also serves as a member of the Research & Development Committee. Defendant Malik has received and continues to receive handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further Defendant Malik signed the 2024 Form 10-K. For these reasons too, Defendant Malik breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123.   Additional reasons that demand on Defendant Pratumsuwan is futile follow. Defendant Pratumsuwan has served as a Company director since January 2025. Defendant Pratumsuwan has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to

cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further Defendant Pratumsuwan signed the 2024 Form 10-K. For these reasons too, Defendant Pratumsuwan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.    Additional reasons that demand on Defendant Southwell is futile follow. Defendant Southwell has served as a Company director since August 2014. He also serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Southwell has received and continues to receive handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Southwell signed the 2024 Form 10-K. For these reasons too, Defendant Southwell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.    Additional reasons that demand on Defendant Wong is futile follow. Defendant Wong has served as Chairman of the Board since January 2018. Defendant Wong has received and continues to receive handsome compensation for his role as Chairman. Additionally, in the 2025 Proxy Statement, the Company admits Defendant Wong is a non-independent director because he an employee of a Company affiliate, RTW Investments. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to

make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Wong signed the 2024 Form 10-K. For these reasons too, Defendant Wong breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.    Additional reasons that demand on the Board is futile follow.

127.    Defendants Björk (as Chair) and Boess (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

128.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and waste of

corporate assets. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

129.     Rocket has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Rocket any part of the damages Rocket suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

130.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

131.     The acts complained of herein constitute violations of fiduciary duties owed by Rocket's officers and directors, and these acts are incapable of ratification.

132.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Rocket. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Rocket, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

133.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Rocket to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

134.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

135.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Rocket's business and affairs.

137.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

138.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Rocket.

139.    In breach of their fiduciary duties owed to Rocket, the Individual Defendants willfully or recklessly caused the Company caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the effectiveness of RP-A501 was overstated (2) to increase RP-A501's effectiveness to be in line with what was disclosed to investors, a C3 inhibitor was added to RP-A501 without being disclosed to investors; (3) the addition of the C3 inhibitor to RP-A501 led to an increased risk patients would suffer SAEs; (4) the Company's projected timeline for RP-A501's second phase of its clinical trial was unreliable; and (5) as a result, the safety and clinical, regulatory, and commercial success surrounding RP-A501 were overstated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

140.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

141.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

142.    In yet further breach of their fiduciary duties, while the Company's stock price was

trading at artificially inflated prices, Defendants Shah and Ondrey engaged in improper insider sales, netting total proceeds of ***approximately $395,017.***

143.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Rocket's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

144.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Rocket has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146.    Plaintiff, on behalf of Rocket, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

147.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants

were unjustly enriched at the expense of, and to the detriment of, Rocket.

149.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Rocket that was tied to the performance or artificially inflated valuation of Rocket, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

150.    Plaintiff, as a shareholder and a representative of Rocket, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

151.    Plaintiff, on behalf of Rocket, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

152.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Rocket, for which they are legally responsible.

154.    As a direct and proximate result of the Individual Defendants' abuse of control, Rocket has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Rocket has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

155.    Plaintiff, on behalf of Rocket, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

156.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Rocket in a manner consistent with the operations of a publicly held corporation.

158.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Rocket has sustained and will continue to sustain significant damages.

159.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

160.    Plaintiff, on behalf of Rocket, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

161.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

163.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Rocket to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and

business from future customers who no longer trust the Company and its products.

164.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

165.     Plaintiff, on behalf of Rocket, has no adequate remedy at law.

### SIXTH CLAIM
### Against Defendants Shah and Ondrey for Contribution Under Sections 10(b) and 21D of the Exchange Act

166.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

167.     Rocket and Defendants Shah and Ondrey are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Shah's and Defendant Ondrey's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

168.     Defendants Shah and Ondrey, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

169.     Accordingly, Defendants Shah and Ondrey are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

170.    As such, Rocket is entitled to receive all appropriate contribution or indemnification from Defendants Shah and Ondrey.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Rocket, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Rocket;

(c)    Determining and awarding to Rocket the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Rocket and the Individual Defendants to take all necessary actions to reform and improve Rocket's corporate governance and internal procedures to comply with applicable laws and to protect Rocket and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Rocket to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

   (e)  Awarding Rocket restitution from the Individual Defendants, and each of them;

   (f)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

   (g)  Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: October 22, 2025

           **THE BROWN LAW FIRM, P.C.**

           */s/ Elizabeth J. Donohoe*
           Elizabeth J. Donohoe
           Zachary M. Benson
           Timothy Brown
           767 Third Avenue, Suite 2501
           New York, NY 10017
           Telephone: (516) 922-5427
           Facsimile: (516) 344-6204
           Email: edonohoe@thebrownlawfirm.net
              zbenson@thebrownlawfirm.net
              tbrown@thebrownlawfirm.net

           *Counsel for Plaintiff*

## **VERIFICATION**

I, Mary Bell, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 22__ day of October, 2025.

DocuSigned by:

*Mary Bell*

245DF7E0CD8D4AD...

Mary Bell